**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Clayton R. JACKSON, Defendant–Appellant.**

No. 94–10095.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1995.

Decided July 25, 1995.

As Amended on Denial of Rehearing and Rehearing en Banc December 15, 1995.*

---

* Judge Hug voted to reject the suggestion for rehearing en banc and Judges Gibson and Goodwin so recommended.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, California and Michael Tigar, University of Texas School of Law, Austin, Texas, for defendant-appellant.

John K. Vincent, Assistant United States Attorney, Sacramento, California, for plaintiff-appellee.

Before: FLOYD R. GIBSON **, GOODWIN, and HUG, Circuit Judges.

GOODWIN, Circuit Judge:

Clayton Jackson was convicted of racketeering (18 U.S.C. § 1962(c)), conspiracy to commit mail fraud and money laundering (18 U.S.C. §§ 1956 and 1341), and mail fraud (18 U.S.C. § 1341) for his part in offering bribes to California state Senator Alan Robbins and establishing a money laundering scheme to funnel the money fraudulently obtained from Jackson's clients to Robbins through California state Senator Paul Carpenter. He appeals.

Jackson's primary contention is that existing caselaw requires the jury to find an explicit quid pro quo to convict Jackson of the racketeering charges predicated on violation of a California bribery statute. The appeal also asserts instructional errors and evidentiary shortcomings, none of which justifies reversal. We affirm.

## I. BACKGROUND

Clayton Jackson, a prominent lobbyist for the insurance industry, was indicted in a sweeping federal investigation of corruption in Sacramento. Senator Alan Robbins, who was convicted on similar charges, was the Chairman of the Senate Insurance Committee. The following summaries set out the facts underlying each of Jackson's convictions.

### A. *Racketeering Act 4—Senate Bill 1719*

In Racketeering Act 4, the indictment charged Jackson with offering a bribe to Robbins in the form of campaign contributions in exchange for Robbins' assistance in defeating Senate Bill 1719 in early 1988. The governor vetoed the bill after both houses had passed it. Robbins then sent Jackson a letter and newspaper articles chronicling Robbins' action against SB 1719. Shortly thereafter, Jackson's client, who would have been adversely affected by the passage of SB 1719, donated $2,000 to Robbins.

### B. *Racketeering Act 5—Workers' Compensation*

During the course of tape-recorded conversations, Jackson offered Robbins a $250,000 bribe. (Unknown to Jackson, Robbins had already been caught and had agreed to wear a wire in consideration for a reduced sentence.) Jackson promised this substantial

---

** The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

reward if Robbins could bring under the jurisdiction of Robbins' friendly insurance committee an upcoming workers' compensation measure that would abolish the minimum rate law. Over a period of months, Jackson and Robbins discussed the outlines of the deal. Jackson promised to raise the money from the small insurance companies he represented, and who would be wiped out if the workers' compensation minimum rate law were abolished. Jackson solicited donations from several insurance executives, telling them that the money would be used to establish a coalition of similar companies backed by a political action committee.

### C. Racketeering Act 6 and Counts II through X—Mail Fraud and Money Laundering

Jackson and Robbins sought to avoid the reporting requirements attached to campaign funds. They enlisted the aid of former senator Paul Carpenter, then serving on the Board of Equalization. Carpenter offered to let Jackson's clients contribute to his campaign committee and then have his campaign committee make payments at Robbins' direction.

Jackson, Robbins, and Carpenter worked out a scheme whereby Jackson had his clients contribute to Carpenter, who, as a member of the Board of Equalization, was relatively immune from criticism for accepting large donations from insurance companies. Carpenter, after taking his cut, would then write checks and mail them to the Goddard Company, ostensibly as compensation for public relations work performed by the Goddard Company. In fact, Jennifer Goddard of the Goddard Co. was a friend of Robbins, did no work for Carpenter, and would merely issue a false invoice to Carpenter in return for the payments. Carpenter carried the lie to the California Secretary of State, mailing mandatory reports character-izing these expenditures of campaign funds as payments for professional services. After taking her cut, Jennifer Goddard would either pass the money on to Robbins directly or spend it on Robbins' personal expenses as he directed.

In all, Carpenter received over $84,000 in contributions from Jackson's clients, at Jackson's request, and passed $78,500 on to Goddard, Robbins' front. Checks mailed from Jackson's clients to Carpenter and the false campaign reports mailed from Carpenter to the Secretary of State supported the jury verdict which convicted Jackson of the mail fraud-related offenses. The deposit of checks paid by Carpenter to the Goddard Co. supported the verdict which convicted Jackson of racketeering predicated on money laundering.

## II. THE BRIBERY–RELATED OFFENSES

### A. The Requirement of a "Quid Pro Quo" Under the California Bribery Statute

Jackson argues that the predicate state bribery offenses charged in Racketeering Act 4 and Act 5 of Count I, the RICO count, require a showing of an explicit agreement to exchange money for a political favor, a quid pro quo, and the district court's failure to so instruct the jury constitutes reversible error.

#### 1. Instructions

Predicate Acts 4 and 5 of the RICO count in the indictment charge Jackson with offering bribes as defined in California Penal Code § 7(6), in violation of California Penal Code § 85.[1]

The district court instructed the jury on bribery, in relevant part, as follows:

> Every person who gives or offers to give a bribe to any Member of the Legislature, or to another person for him, or attempts by menace, deceit, suppression of truth, or any corrupt means to influence a member in giving or withholding his vote . . . is punishable by imprisonment in the state prison for two, three or four years.

---

1. California Penal Code § 7(6) provides:
 The word "bribe" signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity.
 California Penal Code § 85 provides:

No. 27

In order to prove such crime [bribery], each of the following elements must be proved beyond a reasonable doubt:

1. The defendant gave or offered a bribe;

. . . . .

3. The defendant gave or offered such bribe with the specific intent corruptly to influence the other person in his official capacity as to some act, decision, vote, opinion or other proceeding; ...

No. 28

A "bribe" is anything of value or advantage, present or prospective, or any promise to give any such thing asked, given or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given in his action, vote, or opinion, in any public or official capacity.

No. 29

The word "corruptly" imports a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person.

No. 31

To constitute the crime of offering a bribe, it is not necessary that any particular words or conduct be used, provided that the means of communication used, viewed in the light of the attending circumstances, is such as to clearly show that a bribe is being offered. . . . [2]

### 2. *Standard of Review*

■ "Whether a jury instruction misstates elements of a statutory crime is a question of law and is reviewed *de novo.*" *U.S. v. Johnson,* 956 F.2d 197, 199 (9th Cir.1992). There is a great deal of argument in the briefs over whether the plain error or abuse of discre-

---

2. The operative language of instruction No. 27 is taken from the standard California jury instruction on bribery offenses that parallel § 85. *See,* CALJIC (5th ed.) 7.00 (bribery of an executive officer) and 7.01 (bribery of a ministerial official). All the operative language of No. 28 likewise comes from the definition given in § 7(6). *See,* text of § 7(6) at footnote 1, *supra.* Instruction No. 29 is taken verbatim from Cal.Penal Code § 7(3) and CALJIC 7.00.5. Finally, instruction No. 31 matches CALJIC 7.07.

tion standard should apply here. Because the issue is whether *McCormick* implies a quid pro quo element into a § 85 offense, the question is one of law, not merely of the wording of the instructions.

■ The government claims that Jackson failed to preserve the issue with a proper objection and therefore the plain error standard applies. Even absent a formal objection after the rejection of his proposed instruction, Jackson adequately preserved the issue. He argued his quid pro quo point throughout, offered an alternative instruction, and it is clear from the record the court knew of his objection. *See U.S. v. Kessi,* 868 F.2d 1097 (9th Cir.1989) (establishing test to determine whether an issue was adequately preserved absent a formal objection).

### 3. *Discussion*

The heart of the debate is whether the Supreme Court, in *McCormick v. U.S.,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), mandates reading a quid pro quo requirement into California's bribery laws. At the jury instructions conference and now in his brief, Jackson argued that the holding of *McCormick* applies to the California bribery charges, requiring the jury to find an explicit promise or agreement between Sen. Robbins and Jackson to exchange money for the performance of an official act.

In *McCormick,* the Supreme Court interpreted the Hobbs Act, which prohibits extortion under color of official right, and held that a Hobbs Act violation can be found only "if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick, Id.* at 273, 111 S.Ct. at 1816.

The district court's instructions also comport closely with the common understanding of a "bribe" as "a price, reward, gift, or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct especially of a person in a position of trust (as a public official)." *Webster's Third New Int'l Dictionary* (1986).

In support of his assertion that *McCormick* applies to the California bribery statute, Jackson relies on *U.S. v. Freeman*, 6 F.3d 586 (9th Cir.1993). He argues that *Freeman* interpreted the *McCormick* quid pro quo requirement as a constitutional limitation on criminalizing campaign contributions. In *Freeman*, the appellant challenged on First Amendment grounds Cal.Penal Code § 68, which makes it a crime for state employees to ask, receive, or agree to receive a bribe. This Court upheld the constitutionality of § 68, saying that "[a]lthough the defendant state representative in *McCormick* was charged with violating the Hobbs Act rather than RICO [with a predicate violation of § 68], the Supreme Court's decision in that case controls this question." *Id.* at 597.

The district court rejected Jackson's argument that without the requirement of a quid pro quo, the jury may have convicted him for exercising his protected speech in ways that, though offensive to lay persons not calloused by years of political traffic, cannot be constitutionally proscribed. The district court reasoned that *U.S. v. Montoya*, 945 F.2d 1068 (9th Cir.1991), limited the *McCormick* decision to the federal extortion statute under review in that case, and specifically ruled that *McCormick* has no impact on California bribery law. The government on appeal contends that the district court was correct, that *Montoya* has already resolved the issue in its favor, and we agree.

*Montoya* reversed the appellant's Hobbs Act convictions because the jury instructions failed to require a finding of an explicit quid pro quo as mandated by *McCormick*. The appellant then argued that his erroneous Hobbs Act convictions required reversal of his money laundering convictions predicated on California bribery violations (Cal.Penal Code § 86). We rejected that argument, holding that:

> In defining an essential element of the crime of extortion under color of official right the Supreme Court was interpreting a federal crime under the Hobbs Act. This requirement would have no bearing on the construction of the California bribery statute alleged as the predicate "specified unlawful activity" under Count IV.

*Id.* at 1075. *Montoya* made clear that *McCormick* was a case of statutory construction. The question whether California bribery law required proof of quid pro quo for statutory reasons or for first amendment reasons was not before us then and was not decided. These questions remained open two years later when we decided *Freeman*.

██ In *Freeman*, the appellant argued that the RICO statute was unconstitutional as applied in that case "because it chills the exercise of First Amendment rights, namely solicitation of campaign funds." *Id.* at 597. Relying on *McCormick*, we rejected the as applied challenge. Unlike the jury in *McCormick*, the jury in *Freeman* was instructed to find quid pro quo. *Id.* at 594. *Freeman* cited *McCormick* for the proposition that the First Amendment does not protect political contributions made in return for an explicit promise by the official to perform an official act. *Freeman* did not hold the converse, that a failure to require proof of a quid pro quo would violate the First Amendment, and we decline to read such a requirement into First Amendment jurisprudence today. Because the First Amendment does not imply an explicit quid pro quo element into every state bribery offense, and California bribery law does not require an explicit quid pro quo instruction, the absence of one here cannot constitute error.

B. *The Knowledge Instruction was Proper*

The district court defined "knowledge" for the jury in Instruction 30, in relevant part, as follows:

> An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful.

This definition closely tracks the definition offered in the Penal Code and the standard jury instructions. *See*, Cal.Penal Code § 7(5) and CALJIC 1.21.

Jackson contends that a § 85 violation requires that the defendant intend to violate a known legal duty. If this is the case, Jackson argues, then the knowledge instruction

which specifically states that the defendant need not know the law to be convicted contradicts the instructions defining the elements of a § 85 offense. Jackson further argues that the reconciliation of the two instructions offered by California law and argued by the prosecution renders the definition of a bribery offense hopelessly circular.

### 1. *Standards of Review*

■ Whether § 85 requires the defendant to know that his acts were unlawful is a question of law subject to *de novo* review. *U.S. v. Johnson*, 956 F.2d at 199. Because Jackson did not object to the knowledge instruction at trial, this Court reviews the wording of the instructions for contradiction or circularity for plain error only. *U.S. v. Fagan*, 996 F.2d 1009 (9th Cir.1993).

### 2. *Knowledge of Illegality Not Required Under Cal.Penal Code § 85*

Because the definition of "bribe" requires a "corrupt intent to influence, unlawfully", Jackson argues that the defendant must specifically intend to act unlawfully, that is, he must know that his acts are illegal. Given this statutory language, Jackson would have a stronger argument had the California Supreme Court not already foreclosed it. In *People v. Glass*, 158 Cal. 650, 112 P. 281 (1910), the California Supreme Court effectively read the word "unlawfully" out of the bribery statute.[3] In that case, the California Supreme Court held:

The use of the word "unlawfully" as qualifying "to influence" in subdivision 6 of section 7, adds nothing to the meaning of section 165. . . . There can be no intent to corruptly influence an officer in his official capacity, by giving to him money, that is not an intent to unlawfully influence such officer in such action.

*People v. Glass*, 158 Cal. at 676, 112 P. 281.

■ In short, "unlawfully", for purposes of interpreting California bribery statutes, means the same thing as "corruptly"; thus, § 85 requires an intent to influence corruptly only. Contrary to Jackson's argument, a defendant need not intend to break the law to violate § 85. Accordingly, the knowledge instruction did not misstate the elements of § 85 and did not contradict the instructions on the intent required for a § 85 violation.[4]

### 3. *The Instructions Were Not Circular*

Jackson argues that this interpretation of bribery mandated by the California Supreme Court renders the instructions given hopelessly circular. If "unlawfully" here means the same thing as "corruptly", and the instructions define "corruptly" as meaning "unlawful", the argument runs, the instructions are circular and provide no real guidance to a jury. *See, U.S. v. Dorri*, 15 F.3d 888, 894–95 (9th Cir.1994) (Judge Kozinski dissenting) (discussing the circularity of these instructions and their likelihood to confuse a jury).

---

3. In *Glass*, Cal.Penal Code § 165, which prohibits offering or giving bribes to county supervisors, was the subject of review. However, the language of § 165 parallels that of § 85, leaving little doubt that any ruling on the meaning of one section applies to the other. Moreover, the court in *Glass* interpreted the definition of bribe in § 7(6), which is directly at issue in this case.

4. Jackson also argues that "clear import of recent Supreme Court law is that the defendant in a bribery case must specifically intend to violate a known legal duty." However, the Supreme Court cases Jackson cites for this proposition could have no such import on any plausible reading. In *Ratzlaf v. U.S.*, the Court interpreted statutory language conditioning criminality on "willfully violating" particular code sections. The Court read this language as requiring the defendant to know that he was violating the

law. ——— U.S. ———, 114 S.Ct. 655, 658, 126 L.Ed.2d 615 (1994). The Court in *Ratzlaf* defined the intent requirement of a federal statute prohibiting structuring financial transactions to avoid certain reporting requirements. How the interpretation of this federal statute impacts interpretive issues in California bribery statutes, particularly where those issues have already been settled by the California Supreme Court, is unclear. The relevance of *Staples v. U.S.*, ——— U.S. ———, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), is even more remote. The issue in *Staples* was whether a federal statute requiring the registration of certain firearms had any mental state element at all. The Court ultimately ruled that there was a presumed knowledge element, but did not in any way impute that a defendant had to know his acts were illegal to violate the provision.

Whatever may be the merits of this argument, it has no application to the instructions here.

In this case, unlike *U.S. v. Dorri* which Jackson cites, "corruptly" was not defined as "unlawfully", but as "a wrongful design". On these instructions, then, there is no circularity. "Unlawfully" was defined by law as "corruptly" which was defined as a "wrongful design".[5]

■ Taken as a whole, the instruction given did not misstate the intent required under § 85, did not contradict the other intent instructions, and did not render the instructions hopelessly circular.

## C. *The Entrapment Instruction Was Proper*

At trial, Jackson contended that the government entrapped him into offering the $250,000 bribe charged in Racketeering Act 5. The district court instructed the jury almost verbatim from the Ninth Circuit pattern instruction:

> A person is entrapped when the person has no previous intention to violate the law and is persuaded to commit a crime by government agents.

> On the other hand, where a person is already willing to commit a crime, it is not entrapment if government agents merely provide an opportunity to commit the crime.

Jackson now argues that this instruction misstates the law, warranting reversal.

■ There is no question that the instruction given was imperfect. In *U.S. v. Mkhsian*, 5 F.3d 1306, 1311 (9th Cir.1993), we held that an entrapment instruction virtually identical to the one given here was defective due to the ambiguity of the word "already". The imprecision of the term "already" permits a jury to convict without a showing by the government that the defendant was disposed to commit the crime prior to contact with government agents, as required by *Jacobson v. U.S.*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).

■ The consequence of the "already" error is a disputed matter. The government argues that Jackson invited this error, by proposing a similar instruction suffering from the same defect, and then by failing to raise the *Mkhsian* objection to the instruction given. Though the logic of the government's position is sound, in *U.S. v. Lessard*, 17 F.3d 303, 305–06 (9th Cir.1994), we subjected an entrapment instruction with the same defect to plain error review, even though the defendant failed to object. Accordingly, we review the *Mkhsian* error here for plain error.

■ The faulty entrapment instruction does not rise to the level of plain error in this case. Where the evidence virtually compels a finding that the defendant was predisposed, so that the jury would have found the defendant predisposed under *Jacobson* in any event, no plain error exists. *U.S. v. Davis*, 36 F.3d 1424, 1432 (9th Cir.1994). In the present case, there was extremely strong evidence that Jackson engaged in bribery and money laundering schemes prior to the time Robbins began to act as a government agent. (*See*, discussion of the sufficiency of the evidence *infra*.) More importantly, the jury actually convicted Jackson of bribery, mail fraud and money laundering offenses (the predicate offenses of Racketeering Acts 4 and 6) which occurred before Jackson came into contact with government agents. Because Jackson actually committed a similar bribery offense with the same parties before coming into contact with Robbins in his role as a government agent, there can be no question that Jackson was predisposed to offer a bribe as charged in Act 5 prior to his contact with government agents.

Jackson argues that because the offer of the $250,000 bribe dominated the trial, the instructional error on Act 5 tainted the other convictions. Under Jackson's view, the jurors based their findings that Jackson was guilty of the other, less dramatic and less substantiated offenses on their improper con-

---

**5.** Most civilizations have understood the wrongfulness of bribery. Judge Noonan has traced the origins of this understanding in the West back to the prophet Ezekiel. *See* John T. Noonan, *Bribes* (1984). In our political culture, bribery ranks with treason as one of the only two crimes specifically mentioned in the Constitution. *See* U.S. Constitution, Art. II, Section 4.

clusion that Jackson offered a $250,000 bribe. However, there is no reason to believe that the jury improperly bootstrapped up from its conclusion that Jackson committed Act 5 to its conclusion that Jackson committed the other charged crimes. If anything, the jury's not guilty verdicts on the first three charged racketeering acts demonstrate a careful and independent consideration of each offense. Although an improper entrapment instruction may so debase confidence in the judicial process as to constitute plain error in some cases, considering the strength of the government's evidence and the verdicts returned, it does not in this case.

### D. Rejection of Jackson's Proposed Instructions

#### 1. Standards of Review

■ Whether a district court's rejection of a defendant's proposed jury instruction is reviewed *de novo* or for an abuse of discretion is undecided in the Ninth Circuit. *U.S. v. Zuniga,* 6 F.3d 569, 570 (9th Cir.1993). Because the district court's denial of Jackson's proposed instructions was proper even under the more stringent *de novo* standard, we do not resolve the issue here.

#### 2. The Instructions on Legal Activity Were Sufficient

Jackson argues that by refusing several of his proposed instructions describing legal political activity, the district court failed to adequately distinguish bribery from legal activity. Jackson requested instructions stating the legality of lobbying, recommending campaign contributions to specific legislators, soliciting campaign contributions, and receiving political contributions outside the Capitol. The district court did tell the jury in Instruction No. 36, "Making contributions to political campaigns is considered in law to be a form of free speech protected by the First Amendment to the United States Constitution and by the Constitution of California." In Instruction No. 37, the district court defined a "lobbyist" for the jury as "an individual who, for compensation, engages in direct communication with government officials ... for the purpose of influencing legislative action." The district court properly rejected the rest of Jackson's proposed instructions describing legal activity as irrelevant to the issues in the case.

##### a. The Irrelevance of Jackson's Proposed Instructions

■ The law is clear that "[a] trial judge may refuse an instruction if its language gives undue emphasis to defendant's version of the facts rather than being a statement of appropriate principles of [the] law for the jury to apply to the facts, or if it would tend to influence the jury toward accepting the defendant's version of the facts." *U.S. v. Goland,* 959 F.2d 1449, 1453–54 (9th Cir. 1992). In addition, the district court is not required to give an instruction on a point already adequately covered by another instruction. *U.S. v. Joetzki,* 952 F.2d 1090, 1095 (9th Cir.1991).

■ As the trial judge properly concluded, the issue is not whether the jury instructions describe what is indisputably legal behavior, but whether the jury instructions adequately define what is illegal behavior. As discussed above, the instructions defining the elements of bribery were adequate. The additional contrast to legal activity offered by Instruction Nos. 36 and 37 was more than adequate to distinguish legal political activity from the illegal conduct outlined by the other instructions. Inclusion of Jackson's other requested instructions on what was indisputably legal activity not in issue could only weight the instructions toward Jackson's theory that all his conduct was legal, and draw the jury's attention away from the real issue of whether the elements of bribery for the RICO count had been shown. Moreover, Jackson had ample opportunity to and did argue to the jury that his behavior was legal. Under a *de novo* or abuse of discretion standard, the district court did not err.

#### 3. Jackson's Proposed Theory of the Case Instructions Were Unnecessary

Jackson argues that the district court erred by refusing his proposed jury instructions explaining his general theory of the case, that is, that Jackson "never intended to

bribe Robbins but rather Jackson was extorted by Robbins and that Jackson was pretending to go along with a bribe scheme to mollify and put off Robbins so as to avoid possible retaliation against Jackson's clients as well as Jackson personally." Jackson's Proposed Instruction Nos. 16, 17, 18 and 19 would have required the jury to acquit Jackson if they found Jackson lacked the intent to offer a bribe either because Robbins extorted or entrapped Jackson.

The district court rejected these proposed instructions, instructing the jury on extortion instead:

> The crime of bribery requires the specific intent to corruptly influence the legislator in his official capacity as to some act, decision, vote, opinion or other proceeding.
>
> Evidence, if any, that defendant Clayton Jackson was extorted by then Senator Robbins may be considered by you in determining whether or not the defendant Clayton Jackson acted with the specific intent to bribe Robbins during the time frame charged in said Racketeering Act Five.

The court instructed the jury on entrapment, in part, "A person is entrapped when a person has no previous intention to violate the law and is persuaded to commit a crime by government agents."

a. The Instructions Given Were Adequate

■ "It is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory." *U.S. v. Dees,* 34 F.3d 838, 842 (9th Cir.1994). The instructions given in this case adequately covered the law on both Jackson's entrapment and his extortion theories. The addition of Jackson's proposed instructions would have merely repeated the specifics of Jackson's theories which Jackson argued for hours in closing, running the risk of biasing the instructions in favor of one party. *U.S. v. Goland,* 959 F.2d at 1453–54.

■ Moreover, where a defendant's theory turns on lack of intent, jury instructions that accurately reflect the intent required for the offense obviate the need for a specific

instruction on innocent states of mind. *U.S. v. Dees,* 34 F.3d at 842. Because the several instructions given on the intent required to offer a bribe correctly stated the law, Jackson's proposed instructions explaining that no crime would be committed if he intended only to mollify Robbins were unnecessary.

The instructions fully and accurately explained the relevant legal standards and Jackson had a full opportunity to argue his case to the jury. The trial court properly rejected Jackson's proposed jury instructions on what is indisputably legal activity, as well as his redundant and argumentative theory of the case instructions.

E. *The Sufficiency of the Indictment*

Jackson argues that the indictment on Racketeering Acts 4 and 5 was insufficient because it failed to allege an explicit quid pro quo.

■ This Court reviews the sufficiency of an indictment *de novo. U.S. v. Boone,* 951 F.2d 1526, 1542 (9th Cir.1991). An indictment is insufficient if it does not contain the necessary elements of the crime alleged. *Id.* An indictment that tracks the words of the statute violated is generally sufficient, but implied, necessary elements, not present in the statutory language, must be included in an indictment. *U.S. v. Musacchio,* 968 F.2d 782, 787 (9th Cir.1991); *U.S. v. Morrison,* 536 F.2d 286, 289 (9th Cir.1976).

■ As discussed above, Cal.Penal Code § 85 does not have an explicit quid pro quo element. The statutory language describes the sort of implicit quid pro quo that is the essence of bribery—the offer of something of value with the intent to influence corruptly. Because the statutory language, like the instructions given, adequately states the elements required, and the indictment here incorporates the relevant statutes, the indictment is sufficient.

F. *Sufficiency of the Evidence to Convict on Racketeering Act 5*

Jackson finally argues that the evidence of the bribe offer charged in Racketeering Act 5 was insufficient to sustain his conviction. The evidence consisted of tape recorded con-

versations between Jackson and Robbins. Sufficiency was for the jury to decide.

 There is sufficient evidence to support a conviction if, "reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. *U.S. v. Reyes–Alvarado*, 963 F.2d 1184, 1187 (9th Cir.), *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992).[6]

 First, Jackson points to the fact that the $250,000 bribe was never given, suggesting that the money must have been delivered to sustain a conviction predicated on a § 85 violation. As the district court instructed the jury, however, whether a bribe was actually delivered is irrelevant to the issue of whether a bribe was offered in violation of § 85. *People v. Ah Fook*, 62 Cal. 493 (1881) (tender or production of bribe not required). There is no doubt a rational jury could have convicted Jackson on the evidence presented. The FBI caught Jackson on tape asking Robbins to bring workers' compensation legislation under the jurisdiction of Robbins' committee and then offering a "quarter" as payment for Robbins' help when Robbins asked for a "quantification" of the insurance companies' interest. Robbins explained in his testimony that the "quarter" Jackson offered was a $250,000 bribe that Robbins would receive in exchange for routing pending legislation to his friendly committee. Jackson himself admits that he understood Robbins to be discussing bribery. In short, the tape recordings of Jackson's dealings with Robbins create a record replete with unseemly discussions of a $250,000 payment in exchange for a political favor, of who will come up with that payment, and whether they will keep quiet. The record-ings even include a remarkably frank recognition by Jackson of past crimes, of Jackson's and Robbins' shared understanding based on that illicit past, and their ongoing need to avoid federal investigation.

As Jackson argues, the jury could have concluded that Jackson lacked the intent to offer a bribe on this record. However, the jury was also free to take Jackson at his word on the taped conversations and reject Jackson's protestations that he had his fingers crossed when speaking on the tape and has only begun to tell the truth when defending himself against criminal charges in court. Indeed, the district court found Jackson's in-court testimony incredible and increased his sentence on that basis.

## III. OFFENSES RELATED TO MAIL FRAUD AND MONEY LAUNDERING

Jackson asserts that the prosecution pursued theories of mail fraud and money laundering outside those charged in the indictment, creating a host of instructional and evidentiary problems. In a nutshell, Jackson argues that on the money laundering counts, the indictment requires the prosecution to prove that Jackson knew that the donations he solicited were routed to Robbins through the Goddard Company, and that the money routed to Robbins was for Robbins' personal use. Regarding the mail fraud counts, Jackson contends that the prosecution had to prove that Jackson knew of the mailings charged in the indictment. Jackson asserts that the district court erred in 1) rejecting Jackson's proposed instructions that would have clarified these requirements; 2) failing to give unanimity instructions to ensure that all the jurors agreed to the same theory and particular act to convict Jackson; and 3) allowing the convictions to stand where the proof presented diverged from the acts charged in the indictment, rendering the evidence insufficient to sustain convictions on the charged offenses. In fact, the prosecu-

6. The government argues that because Jackson did not renew his motion for acquittal at the close of his case, the sufficiency of the evidence is reviewable only for plain error. However, the district court did not rule on Jackson's acquittal motion until after the jury returned its verdict. Jackson's assertion that the motion remained pending until the close of his case, obviating any need to reassert the same motion, seems correct. The issue was, therefore, adequately preserved and the above standard of review applies.

tion did not argue any theory outside the scope of the indictment, vitiating most of the instructional and evidentiary problems Jackson asserts. The few remaining shortcomings do not rise to the level of reversible error.

## A. Background: The Indictment

In general, the indictment described the scheme through which Jackson would channel money from his insurance clients to Robbins. Jackson would solicit donations from his insurance clients to Carpenter's campaign fund, deceiving his clients both as to the real beneficiary of their donations, and Carpenter's political status. (Jackson did not tell his clients that Carpenter was no longer in the Senate and currently served on the Board of Equalization where he would have little, if any, voice in insurance policy.) After taking his cut of the action, Carpenter would issue checks to Goddard Co. and report these campaign fund expenditures to the Secretary of State as public relations expenses. In fact, Goddard Co. performed no work for Carpenter, other than issuing phony invoices. Jennifer Goddard of Goddard Co. would then either pass the cash on to Robbins directly or spend the money as Robbins directed, after, of course, taking her cut.

Count I, the RICO count, Racketeering Act 6 charges Jackson with mail fraud, 18 U.S.C. §§ 1341 and 2, and money laundering or aiding and abetting money laundering, 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i) and (B)(i). Racketeering Act 6 charges six specific mailings, each a check payable to Carpenter from one of Jackson's insurance clients. Under the money laundering charge, the indictment alleges thirty acts, each a check payable to the Goddard Co. from Carpenter's account. Any single instance of mail fraud or money laundering alone could constitute Racketeering Act 6.

Count II charges Jackson and Carpenter with conspiracy to commit mail fraud and money laundering for their roles in the same scheme to pass donations from insurance companies through Carpenter and Goddard to Robbins as a bribe. This count lists Jackson's solicitations of various insurance companies to donate to Carpenter as Jackson's

overt acts in furtherance of the conspiracy. The indictment lists Carpenter's overt acts as the numerous checks written by Carpenter to the Goddard Co., along with Carpenter's campaign statements mailed to the Secretary of State which mischaracterize these expenditures as payments for professional services.

Counts III through X charge Jackson with specific acts of mail fraud. Counts III and IV are based on the mailing of two checks from Jackson's insurance clients to Carpenter. (These checks are also listed as specific acts of mail fraud in Racketeering Act 6 of Count I.) Counts V through X are based on the Carpenter campaign reports mailed to the Secretary of State.

The jury convicted Jackson of Counts II through X, as well as Racketeering Act 6 of Count I, on both the mail fraud and money laundering prongs.

## B. Mail Fraud–Related Offenses

### 1. Claimed Instructional Errors

The instructional errors on the mail fraud counts Jackson asserts are premised on the government arguing and presenting evidence on a theory of misrepresentation not charged in the indictment. Jackson contends the government improperly argued that Jackson fraudulently solicited donations to Carpenter from his clients by concealing or misrepresenting the fact that Carpenter was no longer a state senator.

Far from being a distinct scheme outside the ambit of the indictment, this fraud argued by the government was an integral part of the scheme charged in the indictment. As Robbins explained in his testimony, the prosecution argued to the jury, and the district court concluded, the fact that Carpenter was no longer in the senate where he would be voting on insurance matters allowed Carpenter to serve as a political heat shield for Robbins. Robbins understandably feared the political consequences of openly taking large sums from the powerful insurance interest. The parties believed Carpenter, who now served on the Board of Equalization, on the other hand, could accept the hefty donations without drawing any scrutiny or sanction because he no longer was directly in-

volved with insurance issues. In this way, Carpenter, an apparently disinterested third party, provided cover for the whole scheme. There can also be little doubt on the record here that if the insurance executives understood that Carpenter was not in the state senate or that their money would be passed on to Robbins, they would not have made the donations Jackson requested.

 Furthermore, the indictment includes this defrauding of Jackson's clients as part of the overall scheme charged. With only slight variation, the indictment alleges in every count:

> *As part of the scheme to defraud and to obtain money by means of false pretenses, defendant CLAYTON R. JACKSON induced unsuspecting lobbying clients to make campaign contributions to Paul Carpenter's campaign committee,* when the defendant CLAYTON R. JACKSON then and there well knew that a substantial portion of the said contributions were not actually for the benefit of Paul Carpenter, but were in actuality to be routed through Paul Carpenter for the direct and indirect benefit of Alan E. Robbins.

(emphasis added). Jackson's argument that this language does not encompass Jackson's misrepresentation of Carpenter's political status to his clients when soliciting these donations simply slices the bologna too thin. Indictments should not be read so narrowly that they must explicitly include every particular argument or bit of evidence a prosecutor may offer at trial.

### a. Unanimity Instructions Not Required

Jackson argues that because the prosecution presented two mail fraud schemes, the district court erred by not giving a unanimity instruction which would ensure that the jurors all agreed upon the same scheme. Jackson also argues that a unanimity instruction was necessary to guarantee that all the jurors agreed upon the same mailing of the several mailings alleged in Racketeering Act 6. Because Jackson did not request a unanimity instruction at trial, the district court's instructions on this matter are reviewed for plain error.

 Where the proof at trial shows more than one scheme, "the jury must be instructed that each of the jurors must find the defendant guilty of participation in the same single scheme to defraud and that the scheme ... is the same scheme as the overall fraudulent scheme in the indictment." *U.S. v. Mastelotto,* 717 F.2d 1238, 1247–48 (9th Cir.1983). Here, however, there was no need for a unanimity instruction. As discussed above, only one scheme, the scheme charged in the indictment, was presented to the jury. There can also be no doubt that all the jurors agreed to at least two of the mailings alleged in Racketeering Act 6. The mailings charged in Count III and IV are the same as those charged in Mailing Acts 5 and 6 in Racketeering Act 6. Because the jurors unanimously agreed upon the mailings in Count III and IV, convicting Jackson on those counts, the jurors necessarily unanimously agreed upon these same two mailings in Racketeering Act 6, removing any possible prejudice Jackson suffered due to the lack of a unanimity instruction. Also, conviction on any of the money laundering acts is also sufficient to convict on Racketeering Act 6, so if the money laundering conviction is proper, there would be no prejudice suffered from a bad instruction on mail fraud.

Finally, even if a unanimity instruction were required in either instance, it would not be plain error. *See, Griffin v. U.S.,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *U.S. v. Castro,* 887 F.2d 988, 993 (9th Cir. 1989).

### b. Rejection of Jackson's Proposed Instruction

 Jackson claims that the district court erred by rejecting his Proposed Instruction No. 23 that he argues "would have emphasized" the scheme charged in the indictment. Again, because the scheme argued was the scheme charged in the indictment, there was no need for a special instruction to distinguish schemes. Moreover, Jackson's proposed instruction is almost a verbatim recitation of the language in the indictment describing the scheme before every count. While it is true that a trial court's failure to orally instruct a jury on the elements of the

charged offense cannot be cured by making a written indictment available to the jury, Jackson does not argue that the instructions did not adequately define the elements of the offense. Rather, Jackson can argue only that his redundant instruction would have offered emphasis of a particular theory. *Guam v. Marquez*, 963 F.2d 1311, 1314 (9th Cir.1992). This lack of emphasis does not render the instructions taken as a whole improper.

### 2. Sufficiency of the Evidence to Convict on Mail Fraud Counts V Through X

▮ Jackson argues that there is no evidence that he knew that Carpenter mailed campaign reports to the Secretary of State, the acts which form the basis of Count V through Count X. Although there is no direct evidence that Jackson knew of specific mailings, there is more than ample evidence from which a rational jury could infer Jackson's knowledge.

The whole aim of the arrangement was to get the bribe money to Robbins without having to report or otherwise expose the fact that Robbins was accepting substantial gifts from Jackson's insurance clients. In order for the scheme to work, Carpenter would have to falsify the campaign reports accounting for the money that was channelled to Robbins. There was evidence that Jackson was fully informed on the scheme and aware of the laws requiring reporting of campaign fund expenditures. Jackson discussed the need to avoid these reporting rules with Robbins on numerous occasions. *See* discussion below regarding evidence that Jackson knew of the scheme. During one of the recorded conversations, Robbins and Jackson.even discussed the benefits of finding a campaign committee through which to filter the bribe money, and both seemed to recognize with glee that they had used Carpenter and his campaign fund for this purpose in the past.

### C. The Money Laundering Offense

Jackson argues that in order for the jury to convict him of the money laundering charges in Racketeering Act 6, the prosecution had to prove that Jackson knew of the Goddard Co.'s role in the scheme and also knew that the money transferred to Robbins was for Robbins' personal use. Because the instructions did not require the jury to find and the proof did not demonstrate that Jackson had this knowledge, Jackson argues, the jury could have improperly convicted Jackson based on the transfer of funds from his clients to Carpenter or on a legal intercandidate transfer of money from Carpenter's campaign fund to Robbins' campaign fund.

### 1. Claimed Instructional Errors

▮ Jackson asserts that the district court erred in denying his proposed instruction requiring the jury to find that Jackson knew the money funneled to Robbins was for Robbins' personal use. As the district court correctly concluded, the crime of money laundering, as charged, does not demand such a finding. The district judge properly instructed the jury that they must find that Jackson knew the money transferred "represented the proceeds of bribery and/or mail fraud" to convict him of money laundering. The question then becomes whether the instructions regarding the underlying crimes of mail fraud and bribery were proper. The instructions were proper and neither crime requires a finding that Jackson knew Robbins put the proceeds to personal use.

Jackson also repeats the argument here that the trial court erred in rejecting his Proposed Instruction No. 23. Again, this instruction is redundant with the indictment and theories argued to the jury. The absence of this instruction, which merely stresses a charge in the indictment, cannot render the instructions taken as a whole inadequate.

Jackson also raises arguments for unanimity instructions on the money laundering charges that parallel his mail fraud contentions. As discussed in the mail fraud section, the scheme the prosecution argued and proved was the same scheme outlined in the indictment. The transfer of funds from Jackson's unsuspecting clients to Carpenter was an integral part of the overall plan to launder Robbins' bribe. Because there was only one scheme argued and shown, no unanimity instruction was necessary to ensure

that the jury all agreed upon the same scheme.

■ Jackson's claim that a unanimity instruction to ensure that all the jurors agreed upon the same financial transaction among the thirty alleged in the indictment has more teeth, but does not depict a case of plain error.[7] The money laundering prong of Racketeering Act 6 charges Jackson with thirty separate acts of money laundering. To convict Jackson, all the jurors had to agree that Jackson was culpable for the same particular act, but the court did not give a unanimity instruction to this effect.

■ However, any harm resulting from this error could not so undermine confidence in the jury's verdict to constitute plain error. Each of the thirty specific transactions charged in Racketeering Act 6 is a check paid by Carpenter to the Goddard Co. Though many separate checks are listed, they all document the same part of the money laundering scheme. Therefore, as the government argues, if Jackson is culpable for one check, he would be culpable for all of them. Jackson may be correct that there should have been a unanimity instruction here, but its absence does not constitute reversible error.

### 2. *Sufficiency of the Evidence on Money Laundering*

■ Jackson recasts the argued instructional errors as challenges to the sufficiency of the evidence with the same results. He makes the baseless assertion that there is no evidence that he knew of the Goddard Company's role in the scheme. First, it is not necessary that the evidence establish that Jackson actually knew of Goddard Co. The evidence need only show that Jackson initiated, concluded, or participated in the initiation or conclusion of the transaction to support a conviction on the substantive offense. *U.S. v. Castaneda,* 16 F.3d 1504, 1511 (9th Cir.1994). Even if Jackson did not know the specific identity of the middle man between Carpenter and Robbins, the evidence is clear that he was instrumental in arranging the

transaction. At a minimum, Jackson initiated the transaction by fraudulently soliciting donations from his clients to Carpenter. *See, U.S. v. Manarite,* 44 F.3d 1407 (9th Cir. 1995), *as amended* (March 15, 1995) (discussing generally the elements and evidence required to substantiate a money laundering offense).

■ The evidence can be even weaker to sustain a conviction for aiding and abetting money laundering, which the indictment also charges in Racketeering Act 6. To convict Jackson on the aiding and abetting charge the jury needed to find only that "(a) the crime was committed, (b) the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured another person to commit the crime, and (c) the defendant acted before the crime was completed." *Id.* It is not necessary for an aider and abetter to know who actually committed the crime. *Id.* at 1512. The entire course of the recorded conversations between Robbins and Jackson evidence Jackson's role as instigator of the deal and advisor to Robbins on how to conduct the deal, establishing aiding and abetting liability even absent any evidence that Jackson knew of Goddard Co.

Furthermore, although there is no direct evidence Jackson knew of Goddard Co. by name, there is plenty of evidence from which a rational jury could infer that Jackson was well aware of Goddard Co. Robbins testified that Carpenter said he would work out the details of the laundering scheme with Jackson. Robbins further testified that shortly thereafter both Jackson and Carpenter confirmed that they had met and worked out the details.

## IV. ISSUES ON APPEAL NOT RAISED AT TRIAL

Jackson's amicus briefs have raised a number of interesting abstract questions, but as they were not presented to the trial court, we have no occasion to speculate about them in deciding whether there was reversible error in this case.

---

7. As with his mail fraud argument, Jackson did not request a unanimity instruction below, so this Court reviews the absence of a unanimity instruction for plain error only.

## V. CONCLUSION

Jackson was caught on tape engaged in behavior so antithetical to and destructive of our political traditions that there can be no serious argument that Jackson is an innocent man convicted by a jury whose real problem was prejudice against the democratic process. Jackson's bribery, money laundering, and mail fraud schemes provide such a clear and extreme case of corruption that there is no danger that legitimate lobbyists could confuse First Amendment political expression with the type of behavior for which Jackson was convicted. Jackson's convictions in no way undercut our nation's commitment to the First Amendment freedoms to lobby and make donations to political causes. The verdict casts no aspersion on the legitimate role professional lobbyists may play in facilitating the exercise of political freedom. If Jackson's convictions, based as they are on the overwhelming evidence amassed by the state and the well-articulated laws of California, chills any activity, they can only chill behavior that is plainly corrupt and plainly proscribed by law.

Because there is no requirement of an explicit quid pro quo under Cal.Penal Code § 85, there was no error in the instructions or evidence on the bribery-related charges. Because the prosecution argued and proved only one money laundering and mail fraud scheme, the scheme charged in the indictment, the instructions were proper and the evidence sufficient on the mail fraud and money laundering charges. Any other shortcomings in the evidence or instructions did not rise to the level of reversible error. Accordingly, we AFFIRM.