**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clayton R. JACKSON, Defendant–
Appellant.**

No. 98–17410.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 2000

Decided April 20, 2000

---

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, California, for the defendant-appellant.

John K. Vincent, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: FLETCHER, CANBY, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge CANBY;
Concurrence by Judge O'SCANNLAIN.

CANBY, Circuit Judge:

Clayton Jackson was an insurance lobbyist and was convicted of various crimes relating to the bribery of California State Senator Alan Robbins. After his conviction was affirmed on direct appeal, *see United States v. Jackson*, 72 F.3d 1370 (9th Cir.1995), Jackson collaterally attacked his conviction under 28 U.S.C. § 2255. The district court denied the motion and Jackson appeals. Jackson asks us to consider the effect of two developments, both of which took place several years after his conviction. In the first incident, Alan Robbins appeared in a later unrelated proceeding and stated under oath that he had never taken a bribe. This statement does not entitle Jackson to relief. Even if Robbins' recantation were available in a new trial, the outcome would not change.

■ In the second development, a former juror in Jackson's trial made a statement to a defense investigator that suggests that the juror may have believed at the time of the trial that Jackson's codefendant, or possibly even Jackson, was tampering with the jury. On appeal we are unable to determine whether, at the time of Jackson's trial, the juror actually believed that a telephone threat he received had come from one of the defendants in the trial. If the juror had believed at the time that the threat was connected with the trial, that fact would place a heavy burden on the government to show there was no prejudice to Jackson. *See United States v. Dutkel*, 192 F.3d 893, 894 (9th Cir.1999). "Because even a single partial juror violates a defendant's constitutional right to a fair trial," *United States v. Angulo*, 4 F.3d 843, 848 (9th Cir.1993), we remand to the district court for an evidentiary hearing on this question.

### I. *The Charges Against Jackson*

In 1993, a jury convicted Clayton Jackson of ten counts of racketeering (Count 1), conspiracy to commit mail fraud and money laundering (Count 2), and mail fraud (Counts 3–10). The charges alleged that Jackson, an insurance industry lobbyist, had bribed California State Senator Alan Robbins, the Chairman of the Senate Insurance Committee, in return for favorable treatment on legislative matters. The allegations charged bribes paid directly to Robbins from 1986 to 1988 (Count One, Acts 1–4). Jackson was also accused of conspiring from May 1986 to January 1989 to bribe Robbins by soliciting contributions from the insurance industry for State Senator Paul Carpenter, later a member of

the Board of Equalization,[1] and funneling this money from Carpenter to Jennifer Goddard at The Goddard Company, whence it was paid to Robbins (Count One, Act 6; Counts 2–10). Finally, Jackson was accused of offering Robbins a $250,000 bribe in 1991 (Count 1, Act 5). Jackson never paid the $250,000 bribe. His offer to do so, however, was recorded on tape because Robbins had agreed in 1991 to inform for the government. Robbins became an informer only after the facts alleged in Counts 2–10 and Acts 1–4 and 6 of Count 1 had transpired.

## II. *Witness Robbins' Recantation*

### A. *Facts*

In December 1991, Robbins pleaded guilty to racketeering. The racketeering count contained five acts. Three of these were for accepting bribes, two of which were alleged to be from Clayton Jackson. As it turned out, these were the 1986 bribes to influence A.B. 3366 and A.B. 799, acts of which the jury failed to convict Jackson (Acts 1 and 2 of Count 1 in Jackson's trial).

In 1996, three years after Jackson's conviction, Robbins appeared as a government witness in the trial of a former tenant of Robbins, Ted Titmas, who had allegedly stolen property from Robbins' home. *See People v. Titmas,* L.A.Super. Ct. No. LA 18253. When defense counsel sought to impeach Robbins with his prior convictions, Robbins denied taking the bribes to which he had pleaded guilty. He also twice denied ever taking a bribe.

### B. *Discussion*

 Jackson contends that this "recantation" by Robbins requires us to overturn his conviction. We treat Jackson's motion under 28 U.S.C. § 2255 as a motion for a new trial, *see United States v. Kearney,* 682 F.2d 214, 219 (D.C.Cir.1982), and review the denial of Jackson's motion for abuse of discretion, *see United States v. Lopez,* 803 F.2d 969, 977 (9th Cir.1986). Jackson is entitled to a new trial if (1) the evidence was newly discovered; (2) Jackson exercised due diligence in uncovering the new evidence; (3) the new evidence is not merely cumulative or impeaching; (4) the new evidence is material; and (5) the new evidence is such that a new trial would probably produce an acquittal. *Id.* Because we conclude that Jackson fails to meet the last requirement, we need not address the others.

The only testimony by Robbins at the *Titmas* trial relevant to Jackson's appeal is Robbins' general denial that he ever took bribes.[2] So far as the record reveals, the issue was not further explored and the denial remains utterly lacking in specificity. The question then becomes whether this general denial is such that a new trial would probably produce an acquittal. *See id.* We are convinced that there is no such probability. Robbins' general denial is preposterous in the face of his earlier pleas of guilty to three acts of bribery, which pleas were entered prior to Jackson's trial. Robbins' testimony at Jackson's trial included the details that his extremely general recantation lacked. Even then, as the district court noted, the jury appears to have been wary of relying on Robbins' testimony in the absence of additional supporting evidence. On the three acts of bribery for which Robbins' testimony was largely uncorroborated, the jury failed to convict Jackson. The jury convicted Jackson of racketeering Acts 4, 5, and 6, for which there was considerable corroboration in addition to Robbins' testimony.

Racketeering Act 5 was supported by a tape recording of a conversation between Jackson and Robbins in which "Jackson offered Robbins a $250,000 bribe." *Jackson,* 72 F.3d at 1373. The bribe was at-

---

**1.** Carpenter left the Senate at the end of 1986.

**2.** Robbins also denied taking the particular bribes to which he pleaded guilty, but those are the bribes of which Jackson was not convicted.

tempted, not completed. It is inconceivable that a jury would acquit Jackson of this racketeering act merely because of Robbins' later denial that he had ever "taken" a bribe.[3]

Racketeering Act 6 charged Jackson with six instances of mail fraud (checks from insurance companies to Carpenter) and thirty instances of money laundering (checks from Carpenter to The Goddard Company). Significant corroborative evidence indicates that Jackson knowingly participated in a scheme to bribe Robbins. That evidence includes: (1) Jackson's solicitation of unusually large amounts of money from the insurance industry on behalf of a member of the Board of Equalization (Carpenter) who had little authority over insurance tax rates; and (2) shell payments from Carpenter to Goddard that were then funneled to Robbins.

In the face of this evidence, Jackson argues that there is no direct evidence, other than Robbins' testimony, that Jackson knew of the Carpenter–Goddard–Robbins connection. On this point as well, however, the jury had before it ample circumstantial evidence that would lead to a conviction despite Robbins' later recantation. As we noted on Jackson's direct appeal, "[t]he whole aim of the arrangement was to get the bribe money to Robbins without having to report or otherwise expose the fact that Robbins was accepting substantial gifts from Jackson's insurance clients." *Jackson,* 72 F.3d at 1384. Nor was it necessary for the jury to find that Jackson actually knew of Jennifer Goddard's role: "The evidence need only show that Jackson initiated, concluded, or participated in the initiation or conclusion of the transaction to support a conviction on the substantive offense." *Jackson,* 72 F.3d at 1385 (citing *United States v. Castaneda,* 16 F.3d 1504, 1511 (9th Cir.1994)). Thus,

there was significant evidence to corroborate Jackson's guilt on Act 6. The district court did not abuse its discretion in concluding that the jury would have convicted Jackson on Act 6 even had Robbins' recantation been available at trial.

We need go no further. Racketeering under 18 U.S.C. § 1962(c) requires at least two acts of "racketeering activity." 18 U.S.C. § 1961(5). In light of our conclusion that the jury would have entertained no reasonable doubt on Acts 5 and 6, we need not consider the effect of Robbins' recantation on the jury's finding with respect to Act 4. Similarly, the mail fraud and conspiracy convictions draw their support from Act 6, and would not change because of Robbins' recantation.

■ We also reject Jackson's alternative request for an evidentiary hearing on Robbins' recantation. It is difficult to imagine what purpose a hearing would serve: Robbins pleaded guilty to bribery, and testified at length at Jackson's trial. No hearing is required because, as we concluded above, Jackson has not stated a claim for relief. *Shah v. United States,* 878 F.2d 1156, 1158 (9th Cir.1989); *see also* 28 U.S.C. § 2255. The district court did not abuse its discretion in so holding, *see United States v. Andrade–Larrios,* 39 F.3d 986, 991 (9th Cir.1994), and we affirm this portion of its order.

### III. *Alleged Jury Tampering*

#### A. *Facts*

During jury deliberations at Jackson's trial, a juror reported receiving a threatening phone call from an unidentified person. The district court conducted a voir dire inquiry, at which the juror related that he believed that the call probably was unconnected with the trial. The court found

---

**3.** Jackson contends that he was entrapped into making the bribe offer in Act 5, and that we affirmed despite a faulty entrapment instruction only because the jury's conviction of other acts of bribery prior to Act 5 conclusively showed that Jackson was predisposed to commit the crime. *See Jackson,* 72 F.3d at

1378. We need not revisit the entrapment issue, because we conclude that Robbins' recantation would have no effect on Jackson's conviction for racketeering Act 6, which preceded Act 5 (and occurred before Robbins became an informant). Thus predisposition is still clearly demonstrated.

that the juror could be fair and impartial. It then instructed the juror not to relate the incident to other jurors, and permitted the juror to continue deliberating with the rest of the jury. Jackson did not object.

Three years later, in February 1997, Jackson's investigator interviewed the juror. According to the investigator, the juror stated that "at the time he received. the phone call," he thought the call was related either to his involvement in local politics or

> it was a desperate attempt to hang the jury. Carpenter [Jackson's co-defendant] seemed the most likely source. He had training in psychological warfare. He'd been in psych-ops. If I had to guess, I'd say it was Carpenter and maybe Jackson conspired with him. At the time I thought it's either someone from the District or it's them. I guess I thought it was fifty-fifty. At the meeting with the judge I told them I was comfortable it wouldn't influence me and they all seemed comfortable with it.

The juror later refused to sign the statement given to the investigator although, according to the investigator, the juror represented that the contents of his statement were true.

### B. *Discussion*

Jackson contends that the district court should have granted him a new trial or, failing that, an evidentiary hearing to determine whether the juror who reported the threatening phone call (1) perceived the threatening phone call as attempted jury tampering, or (2) failed to tell the truth with respect to the threatening phone call. We agree that an evidentiary hearing is required.

■ The government contends that Jackson has procedurally defaulted on this issue, because he made no objection when the district court found that the juror's impartiality was unaffected by the call and permitted the juror to remain on the jury. *See United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The State contends that all parties had to be aware of the possibility that the

juror believed the call might have been connected with the trial. The State emphasizes that the juror stated that the call "probably" came from other sources, leaving open the substantial possibility that the juror also thought it could have come from one of the defendants.

We conclude that the State is making too much of the single word, "probably." The juror's responses on voir dire would reasonably have been interpreted as negating a belief that the call was connected with the trial. To illustrate, we quote the voir dire at some length:

> Court: Do you believe that the call you received over the weekend was in any way related to your service as a juror in this case?
>
> Juror: I don't—I don't think so. I have other personal reasons to think it is probably something related to my local environment.
>
> I am fairly active in attending meetings of [my] community service district. And as things go up in El Dorado County, they are pretty much—I call them and the district attorney calls them a lawless bunch—the community service district unlike cities or counties have very limited purposes except our district, they just do whatever they want. And if nobody objects then the tax payers pay for their extraneous projects.
>
> And I object and a number of other people object. And one of our neighbors recently filed a taxpayer lawsuit against the district. And she has since been getting crank phone calls and harassing phone calls. And since they know that I am a supporter of her cause that it doesn't surprise me to get harassing phone calls once in a while.
>
> This is not like most of them though where somebody's—you know, it was kind of bizarre, but I felt just because of this case that I had to identify the fact that the call was made. And I personally am concerned more about

the people up in my district, not that they will do anything. . . .

Court: Is it true that your phone at home is not in your name?

Juror: Yes, that was the other reason I thought it wasn't related to this case, because I know I am the only jurist that's had his last name mentioned in the court and my name is not in the phone book, my wife retained her maiden name and the phone is under her name.

After a discussion of how the juror reported the phone call, the questioning regarding the phone call continued:

Court: Did you, yourself, have any concerns . . . that this phone call may put you in some jeopardy?

Juror: No. Just I am used to the nature of this Cameron Estates up there. It's been a long—about a twenty year battle. I have only lived there for about six years or seven years and I have neighbors that are very well aware of some of the people. I mean, they get close to vigilante type tactics over this little community service district thing, they thin[k] it's still a homeowners association and they aren't willing to recognize that it was created as a government agency, a local agency. And it's just a little continuous kind of a game.

. . .

Court: Is there anything in connection with this incident then that you feel might affect your ability to continue as juror in the case?

Juror: No, I don't think so.

The thrust of the juror's statements is clear, and it is directed away from the trial. The statements gave Jackson no reason to object. They certainly did not foreshadow the juror's later alleged statement to the defense investigator that there was a "fifty-fifty" chance that the threat came from a defendant. The issue is not defaulted.

 Jackson is entitled to an evidentiary hearing on his claim "[u]nless the motion and the files and records of the case conclusively show that [he] is entitled to no relief." 28 U.S.C. § 2255. "[I]n determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Angulo,* 4 F.3d at 847.

The discrepancy between the juror's statements during the voir dire and his later statement to the investigator calls for a resolution that can be reached only through an evidentiary hearing. At trial, the juror responded in the negative to at least three very direct questions: (1) "Do you believe that the call you received over the weekend was *in any way related* to your service as a juror in this case?"; (2) "Did you, yourself, have *any concerns* . . . that this phone call may put you in some jeopardy?" and (3) "Is there *anything* in connection with this incident then that you feel might affect your ability to continue as a juror in this case?" (Emphases added). In contrast, the juror's statement to Jackson's investigator, if credited, suggests that the juror's impartiality at trial may have been seriously compromised. The juror suspected "a desperate attempt to hang the jury" and stated that, "if [he] had to guess," he would say that Jackson's co-defendant Carpenter was the source. He said that it was "fifty-fifty" whether the threat was from his neighborhood group or "them," meaning the defendants. If this statement truly represents the juror's views at the time of trial, our precedent in *Angulo* is almost directly on point. In *Angulo,* a juror received an anonymous phone call during the trial in which the caller said "I know where you live." *Id.* at 846. Although the juror was dismissed, we held that the call threatened prejudice to the defendant because the remaining jurors who learned of the call "may well have believed that defendants were responsible for the threat and, based on that assumption, may have decided the merits of the case on that basis." *Id.* at 847.

We acknowledge the possibility that the juror's current biases, if such they are, may be attributable to an encounter the juror had with a reporter after the trial. That encounter, according to the affidavit, "convinced [the juror] the threat was connected with his service as a juror." But the affidavit explicitly refers to the juror's beliefs at the time of the trial. We do not think it possible to determine on this record that the juror did not become concerned that the phone call related to the Jackson case until after the trial was over. The district court could have resolved this question without a hearing only by finding that the investigator's statement was inherently incredible. This it did not do. If the juror believed the phone call to be an attempt by Jackson's co-defendant, or by Jackson, to "hang the jury," the phone call threatened serious prejudice to Jackson.

■ This kind of tampering "cuts to the heart of the Sixth Amendment's promise of a fair trial, [and] we treat jury tampering cases very differently from other cases of jury misconduct." *Dutkel,* 192 F.3d at 894. "Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption." *Id.* (quoting and following *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)); *see also Angulo,* 4 F.3d at 846.

■ We conclude that the motion, files and record in this case could not have shown conclusively that Jackson is not entitled to relief. *See* 28 U.S.C. § 2255. The district court abused its discretion, therefore, by failing to hold an evidentiary hearing on the affidavit by Jackson's investigator. Accordingly, we vacate that portion of the district court's order that denied relief on the jury-tampering claim. We remand the matter to the district court for further appropriate proceedings, including "a hearing, in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial." *Angulo,* 4 F.3d at 847 (emphasis omitted) (citing *Remmer,* 347 U.S. at 229–30, 74 S.Ct. 450); *Smith v. Phillips,* 455 U.S. 209, 216, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *see also Dutkel,* 192 F.3d at 894–95.[4] If the district court determines that the juror (or other jurors) believed at the time of the trial that the phone call might have been an attempt by one of the defendants to hang the jury, the district court shall require the government to show that the threatening phone call was harmless beyond a reasonable doubt. *See Angulo,* 4 F.3d at 848.[5] If the government cannot make this showing, the district court should order a new trial. *See id.* Alternatively, if the district court finds that there was no such belief on the part of any juror, or finds that the government has established harmlessness beyond a reasonable doubt, the district court may enter a new order denying relief.

**AFFIRMED IN PART; VACATED IN PART, and REMANDED with instructions.**

O'SCANNLAIN, Circuit Judge, concurring:

I agree with the court that the district court properly dismissed Clayton Jack-

4. We reject Jackson's contention that the magistrate judge must be disqualified from presiding over any proceedings on remand. The magistrate judge has certified that, although the prosecutor's wife is one of his staff attorneys, that staff attorney has not participated in the review of this case nor has anyone participating in the review discussed the case with her. A reasonable person with knowledge of these facts would not question the magistrate judge's impartiality. *See Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 714 (9th Cir.1990).

5. Jackson urges that the district court also be instructed to apply the standard for ordering a new trial on the basis of juror dishonesty. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). We leave this contention to the district court to address if appropriate to the facts as they are developed by the district court on remand.

son's 28 U.S.C. § 2255 motion alleging that Alan Robbins' testimony in another proceeding warrants a new trial. I also concur, reluctantly, with the court's remand for an evidentiary hearing on the jury tampering issue. I believe that *United States v. Dutkel,* 192 F.3d 893 (9th Cir. 1999), and *United States v. Angulo,* 4 F.3d 843 (9th Cir.1993), compel this result.

I write separately, however, to reiterate the position I expressed in my concurrence in *Dutkel* regarding the presumption of prejudice in cases of alleged jury tampering. *See id.* at 899 (O'Scannlain, J., concurring). I believe that by failing to acknowledge, contrary to three other circuits,[1] that the presumption of prejudice in alleged jury tampering cases established by *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), has since been modified by the Supreme Court in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we have veered dangerously close to "delegat[ing] to every reprobate the power to effect a mistrial." *United States v. Williams,* 737 F.2d 594, 612 (7th Cir.1984). We now have a hair trigger in this circuit for evidentiary hearings in cases of alleged jury tampering and we have placed too heavy a burden on the government at such hearings. While I concur in the court's disposition because I am bound by our circuit precedent, I continue to believe that the teaching of *Phillips* and *Olano* is that when defendants allege jury tampering, they "must establish that prejudice was likely to have resulted before the government should be required to prove the harmlessness of the intrusion." *Dutkel,* 192 F.3d at 899 (O'Scannlain, J., concurring). To hold otherwise is to invite mischief on a defendant's behalf sufficient to cause a mistrial by concocting threats in ways that can not be traced back to their source.

1. *See United States v. Sylvester,* 143 F.3d 923 (5th Cir.1998); *United States v. Williams-Davis,* 90 F.3d 490 (D.C.Cir.1996); *United States v. Zelinka,* 862 F.2d 92 (6th Cir.1988).