**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 16, 2012

No. 11-60564

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

DAVID ZACHARY SCRUGGS,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, DAVIS, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

David Zachary Scruggs ("Scruggs" or "Zach Scruggs") pleaded guilty to an one-count superseding information charging misprision of a felony in violation of 18 U.S.C. § 4. The district court sentenced Scruggs to fourteen months imprisonment and one year of supervised release. After he was released from prison but before the conclusion of his term of supervised release, Scruggs filed a Motion To Vacate Conviction Pursuant to 28 U.S.C. § 2255.[1] In his § 2255

---

[1] While serving his term of supervised release, Scruggs was "in custody" for purposes of § 2255. *See Matus-Leva v. United States*, 287 F.3d 758, 761 (9th Cir. 2002); *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999); *United States v. Brown*, 117 F.3d 471, 475 (11th Cir. 1997); *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995); *United States v. Essig*, 10

No. 11-60564

motion, Scruggs claimed (1) that, in light of the Supreme Court's decision in *Skilling v. United States*[2] and other legal developments, he was actually innocent of all charges, (2) that his guilty plea was involuntary due to government misrepresentation of potential testimony of a prospective witness, and (3) that he received ineffective assistance of counsel because his original trial counsel had a conflict of interest.

After holding an evidentiary hearing, the district court denied Scruggs's § 2255 motion.[3] The district court granted a certificate of appealability ("COA") on three issues: whether Scruggs met the standard for proving his "actual innocence"; whether his guilty plea was involuntary due to government misrepresentation; and whether he received ineffective assistance of counsel. After careful consideration, we AFFIRM.

## I.

This case arose out of an attempt to corrupt Judge Henry Lackey, a Mississippi state judge, in connection with a Hurricane Katrina-related lawsuit styled *Jones v. Scruggs*. The actors in the scheme included three members of The Scruggs Law Firm ("the Firm"): Zach Scruggs, his father Richard Scruggs, and Sidney Backstrom. Also involved were Timothy Balducci, an attorney who worked regularly with the Firm, and Steven Patterson, Balducci's associate who worked with the Firm on various projects and joint ventures but was not an attorney.

---

F.3d 968, 970 n.3 (3d Cir. 1993); *see also Maleng v. Cook*, 490 U.S. 488, 491 (1989) ("Our interpretation of the 'in custody' language has not required that a prisoner be physically confined in order to challenge his sentence on habeas corpus.").

[2] 130 S. Ct. 2896 (2010).

[3] *United States v. Scruggs*, No. 3:07CR192-B-A, 2011 U.S. Dist. LEXIS 86405 (N.D. Miss. Aug. 3, 2011).

No. 11-60564

Zach Scruggs, Richard Scruggs, and Backstrom had worked on Hurricane Katrina litigation against State Farm Insurance Company. That litigation resulted in the *Jones* suit, which involved a dispute over the division of several millions of dollars in attorney's fees arising from a settlement with State Farm. The scheme began with a March 2007 meeting at the Firm between Balducci and Patterson and Zach Scruggs, Richard Scruggs, and Backstrom. Zach Scruggs and Patterson knew that Balducci had a close personal relationship with Judge Lackey, and the group decided that Balducci would approach Judge Lackey in an ex parte manner and speak favorably about Richard Scruggs and the Firm in relation to the *Jones* suit.

Balducci met with Judge Lackey and explained that he would consider it a personal favor if the judge could resolve the *Jones* suit in favor of the Firm and Richard Scruggs by sending the whole case to arbitration or dismissing some claims and sending the case to arbitration. Balducci also said he hoped to have Judge Lackey become "Of Counsel" with his law firm upon retirement. Judge Lackey became suspicious that he was being asked to do something illegal and contacted the U.S. Attorney's Office. The U.S. Attorney's Office and FBI installed recording devices on Judge Lackey's telephone and in his chambers. The FBI later tapped Balducci's cell phone and Patterson's land line.

About a month after Balducci's meeting with Judge Lackey, Backstrom contacted Balducci and told him that the strategy had changed and that the Firm wanted Judge Lackey to send the entire *Jones* suit to arbitration, rather than dismiss some of the claims. Balducci received an order along those lines to present to Judge Lackey. Over the course of the next month, Balducci twice visited Judge Lackey to discuss the order. After a few months, Judge Lackey asked Balducci: "If I help them, will they help me?" Balducci said he could "get that done."

3

No. 11-60564

After meeting with Judge Lackey again a few days later, Balducci placed a call to the Firm. During the call, according to Balducci's account, Balducci told Backstrom that Judge Lackey wanted $40,000 to enter an order compelling arbitration in the *Jones* suit. He asked Backstrom whether "y'all" or "they" would reimburse him for the $40,000, and Backstrom replied that he would get back to Balducci and let him know.[4] Two or three days later, Balducci talked to Backstrom again on the phone about the $40,000, and Backstrom said, "You're covered."[5]

Balducci visited the Firm to pick up the arbitration order for Judge Lackey to sign and then delivered the proposed order with an initial installment of $20,000 to Judge Lackey. A few weeks later, on October 18, Balducci delivered $10,000 in cash to Judge Lackey and picked up the order. Later that day, Richard Scruggs told Balducci that he had developed a cover story to reimburse Balducci and Patterson for the $40,000 payment to Judge Lackey: the reimbursement would be under the cover of hiring Balducci for $40,000 to create a voir dire template for an upcoming trial. When Balducci delivered Judge Lackey's order to the Firm that day, he saw Zach Scruggs and gave the order to him. Balducci then picked up the $40,000 reimbursement check and voir dire materials from Richard Scruggs's desk.

Later that same day, Balducci telephoned the Firm and told Backstrom that he had delivered the copy of "those papers we've been waiting on." Later in the telephone call, Balducci added, "[J]ust so you'll know . . . Dick hired me to prepare voir dire for the upcoming Katrina trial y'all got in Jackson County."

---

[4] At the evidentiary hearing, Backstrom denied that this call took place and denied knowing that a bribe had been paid until a later date. However, Balducci testified that he remembered the call clearly, and the record indicates that a four-minute call from Balducci to the Firm occurred at 10:08 a.m. on the day in question.

[5] Again, Backstrom denied the call occurred.

4

No. 11-60564

Backstrom said that was a "good deal for everyone."  The telephone call was recorded.  In the weeks that followed, several members of the Firm, including Zach Scruggs, called Patterson "looking for Tim [Balducci]" about the status of the voir dire.

On November 1, 2007, Balducci met with Judge Lackey in his chambers to deliver the remaining $10,000 payment and pick up a newly revised arbitration order.  After the meeting, an FBI agent approached Balducci, escorted him to an FBI vehicle, and showed him the video of him paying the bribe to Judge Lackey.  Balducci immediately agreed to cooperate with the Government.

Balducci wore a body microphone to the Firm later that afternoon.  In Backstrom's office, Balducci told Backstrom that before Judge Lackey could file the order that Balducci had delivered to Zach Scruggs two weeks earlier, the plaintiffs in the *Jones* litigation had filed a motion opposing sending the case to arbitration and that Judge Lackey had amended the order to reflect his consideration of the new filing.  At this point, Zach Scruggs entered Backstrom's office, and Balducci told him: "Zach, let me bring you up to speed.  Alright, this is on the Judge Lackey deal.  Ok?"  He told Scruggs and Backstrom that the judge wanted the new language in the order approved before it was entered.  Balducci said, "I mean, we can do whatever we wanna do if you wanna clean up any . . . ."  Scruggs replied, "I don't know how to clean it up other than, uh, 'cause I don't know what he's trying to say."

The three discussed whether they wanted the *Jones* suit dismissed by Judge Lackey and sent to arbitration, as opposed to merely stayed pending arbitration.  Scruggs replied: "Well, what if Judge Lackey retires on the bench and some other [expletive] gets a hold of it? . . .  I, that's what I think and thought the court was gonna do. . . .  I mean, Lackey's uh, uh, fine but you know

No. 11-60564

who the [expletive] else is gonna get this thing." Balducci responded: "I don't know that I'll have the stroke with the next one."

Soon after, an intern-receptionist named Ashley Young knocked and opened the door to Backstrom's office to tell Zach Scruggs that he had a phone call from a "Tracy Lott." Scruggs told Young to tell the caller he was not there and take a message. Young agreed to take the message. Scruggs said, "Thanks," and the door to the office closed loudly. Scruggs then immediately spoke again, saying, "I don't wanna answer a Tracy Lott who I don't know anything about by off chances." After a few seconds' pause, the conversation continued:

> Balducci: Um, the other piece of this puzzle I hadn't told you yet is uh, get it how you want it because I've got to uh, I've gotta go back for another delivery of sweet potatoes down there. So. Because of all of this that has come up.
>
> Backstrom: Mmm-hmm.
>
> Balducci: So get it right. Get it how you want it 'cause we're payin' for it to get it done right.

Backstrom read part of the order aloud and concluded that he "wouldn't change anything." The door then closed loudly again, and Balducci and Backstrom continued their conversation without Zach Scruggs. Balducci asked if Richard Scruggs was angry over how long it had taken to get the order from Judge Lackey. Backstrom responded that he had placated Richard by telling him that there was a lack of urgency. Backstrom said "they bought that for a little while" but then "they just got it in their heads that they wanted it" and asked Backstrom to call Balducci. Balducci said he could put those concerns to rest.

Balducci then went to Richard Scruggs's office and told Richard that Judge Lackey needed another $10,000 payment on the "Johnny Jones order business."

6

No. 11-60564

Richard Scruggs agreed to "take care of it" and said he would reimburse Balducci for the $10,000 bribe by hiring him to do jury instructions in addition to the voir dire research. Richard Scruggs followed up by sending Balducci a letter stating that he appreciated Balducci's offer to draft the proposed jury instructions and enclosing a $10,000 check.

On November 13, 2007, at the direction of the Government, Balducci called Backstrom. During the phone call, Balducci said "I was just gonna come see you, but I could go see Zach or Dick," and he told Backstrom he had the new order from Judge Lackey. Balducci asked whether Backstrom "really want[ed]" the case to go to arbitration, or whether he wanted the case to stay with Judge Lackey. Backstrom responded that he wanted to "stay the course."

Fifteen days later, Zach Scruggs, Richard Scruggs, Backstrom, Patterson, and Balducci were indicted.

\* \* \*

Zach Scruggs was originally represented by a lawyer named Anthony Farese. For several weeks in December 2007 and January 2008, Farese represented both Zach Scruggs and a man named Joey Langston. Langston and Richard Scruggs were defendants in a separate case charging judicial bribery.[6] That second case involved the bribery of Judge Bobby DeLaughter in an underlying suit styled *Wilson v. Scruggs*. Langston was arrested on December 10, 2007, and at a January 4 meeting, prosecutors discussed with Langston and Farese "the potential conflict or the appearance of a conflict" based on the fact that Farese was representing Langston in the *Wilson*/DeLaughter matter and Zach Scruggs in the *Jones*/Lackey matter. At that point, Langston had not indicated to the Government that Zach Scruggs knew anything about the

---

[6] *See United States v. Langston*, No. 1:08CR003-M-D (N.D. Miss. filed Jan. 7, 2008); *United States v. Scruggs*, No. 3:09CR002-D-A (N.D. Miss. filed Jan. 6, 2009).

*Wilson*/DeLaughter matter and the Government had no evidence that Zach Scruggs was involved in the *Wilson*/DeLaughter matter.

On January 7, 2008, Langston pleaded guilty in the *Wilson*/DeLaughter case, and Zach Scruggs waived in writing any potential conflict between Farese's representation of Langston in the *Wilson*/DeLaughter case and Farese's representation of Zach Scruggs in the *Jones*/Lackey case. On January 9, 2008, Zach Scruggs fired Farese as his lawyer. A few weeks later, the Government filed a notice informing the court that it intended to introduce similar acts evidence at trial pursuant to Rule 404(b) of the *Federal Rules of Evidence*. The information that the Government provided to defense counsel at that point indicated only that the Government intended to offer evidence of Richard Scruggs's participation in the scheme with Langston to bribe Judge DeLaughter. The defendants then filed a joint motion *in limine* to exclude the Government's Rule 404(b) evidence.

Before a motions hearing in the *Jones*/Lackey case on February 21, 2008, one of the prosecutors spoke with Langston in a witness room at the courthouse for a few seconds, asking, "Did Zach know?" Thinking that the prosecutor was asking whether Zach Scruggs knew that Langston and Richard Scruggs had hired the lawyer Ed Peters in *Wilson v. Scruggs*, Langston replied, "Yes." During the motions hearing, the Government suggested that Langston was "prepared to testify that Zach Scruggs was fully aware of what was going on in the [*Wilson*/DeLaughter] case." Later in the same hearing, the Government softened that assertion, explaining that it had become "aware of some evidence that might indicate that Zach Scruggs might have some knowledge of the back door attempt to influence Judge DeLaughter." Five days later, the district court denied the joint motion *in limine* to exclude the Rule 404(b) evidence.

On March 19, Zach Scruggs filed a new motion to exclude extrinsic evidence pursuant to Rule 404(b), arguing that the proffered evidence was

No. 11-60564

irrelevant to and not probative of intent. The court scheduled a hearing on the motion for March 21. However, no hearing on the motion was held. Instead, in exchange for dismissal of all charges in the original indictment, Zach Scruggs pleaded guilty to a one-count information charging him with misprision of a felony in violation of 18 U.S.C. § 4. By that time, the other defendants had pleaded guilty to Count One of the original indictment, which charged a conspiracy to bribe Judge Lackey. The district court sentenced Zach Scruggs to a term of fourteen months imprisonment and one year of supervised release. Scruggs did not file a direct appeal.

## II.

Section 2255 relief may be afforded if the movant's sentence "was imposed in violation of the Constitution or laws of the United States, or [if] the court was without jurisdiction to impose such sentence, or [if] the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."[7] Review under § 2255 ordinarily is limited to questions of constitutional or jurisdictional magnitude.[8] If a § 2255 movant failed to raise a claim on direct appeal, he may not raise it on collateral review unless he shows cause and prejudice or that he is actually innocent.[9] We review the district court's legal conclusions *de novo* and its factual findings for clear error.[10]

## III.

The district court certified only three issues for appeal, and Scruggs has not moved this court to expand the COA. Nonetheless, Scruggs opens his brief

---

[7] 28 U.S.C. § 2255(a).

[8] *See United States v. Timmreck*, 441 U.S. 780, 783-84 (1979); *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001).

[9] *See Bousley v. United States*, 523 U.S. 614, 622 (1998).

[10] *United States v. Rivas-Lopez*, 678 F.3d 353, 356 (5th Cir. 2012).

No. 11-60564

with a new, fourth claim, arguing that, under *Skilling*, the district court lacked subject matter jurisdiction to accept his guilty plea. This claim was neither included in Scruggs's § 2255 motion nor argued in his memorandum in support of that motion. Indeed, Scruggs did not make a *Skilling*-based jurisdictional argument at any point in the court below.

We do not consider claims raised for the first time on appeal or issues not included in a COA.[11] Of course, a challenge to the court's subject matter jurisdiction over a case may be raised at any time because it goes to the court's very power to hear the case.[12] But at issue in Scruggs's claim is not that the court lacks power to adjudicate this case – his § 2255 motion – but rather a want of jurisdiction in his criminal case. Jurisdictional claims are subject to the one-year limitations period for § 2255 claims,[13] and such claims may only form the basis for second or successive § 2255 motions if movants meet the requirements of §§ 2244 and 2255(h).[14] In sum, the statutory limitations on § 2255 review

---

[11] *See Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997).

[12] *See United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court.").

[13] *See* 28 U.S.C. § 2255(f); *Barreto-Barreto v. United States*, 551 F.3d 95, 100 (1st Cir. 2008) ("Nothing in the language of § 2255 suggests that jurisdictional challenges are exempt from the one-year limitations period. To the contrary, § 2255(f) explicitly states that the limitations period 'shall apply' to all motions made under § 2255."); *Williams v. United States*, 383 F. App'x 927, 930 (11th Cir. 2010) (per curiam) (unpublished) (same); *United States v. Wolff*, 241 F.3d 1055, 1056 (8th Cir. 2001) (same).

[14] *See* 28 U.S.C. §§ 2244, 2255(h); *United States v. Bell*, 447 F. App'x 116, 118 (11th Cir. 2011) (per curiam) (unpublished) (holding that absent authorization from the Eleventh Circuit, the district court lacked jurisdiction to consider a second or successive § 2255 motion raising a jurisdictional challenge to the movant's sentence); *In re Cline*, 531 F.3d 1249, 1253 (10th Cir. 2008) (denying authorization for jurisdictional claim in a successive § 2255 motion where the movant failed to demonstrate that the claim satisfied statutory requirements).

apply to jurisdictional claims.[15] We see no reason why a § 2255 movant hoping to raise a jurisdictional challenge to his conviction on collateral review should be excused from including the claim in his § 2255 motion or from seeking to have it certified for appeal.[16]

Regardless, Scruggs's "jurisdictional" claim fails on its merits. Scruggs urges that the facts he admitted at the time of his guilty plea and the facts that everyone understood to underlie his plea established only that he knowingly concealed Balducci's attempt to use personal influence to deprive the State of Judge Lackey's honest services – pre-*Skilling* honest services fraud – and not that he knowingly concealed any bribery. This argument would have considerable purchase as a challenge to the validity of his plea, but as a challenge to the district court's subject matter jurisdiction, it is insufficient.

Scruggs in essence confuses a failure of fact with want of power to adjudicate. Under 18 U.S.C. § 3231, "[t]he district courts of the United States

---

[15] In addition, this court has stated in dicta that jurisdictional claims not raised on direct appeal are procedurally defaulted and cannot be raised on collateral review without a showing of cause and prejudice or actual innocence. *See, e.g.*, *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996); *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc). In a recent case, the district court granted a certificate of appealability on the question of whether a claim of want of subject matter jurisdiction could be procedurally defaulted, *see United States v. Underwood*, 597 F.3d 661, 664 (5th Cir. 2010), but we did not reach that question in our opinion, *see id.* at 672-73. We again decline to reach it here.

[16] *See* 28 U.S.C. § 2253(c); *Lackey*, 116 F.3d at152 ("We decline to address those issues rejected by the district court because they are outside the ambit of the COA. . . . And we decline to address those claims that Lackey has raised for the first time on appeal because those issues are deemed waived." (citation omitted)); *see, e.g.*, *United States v. Garza*, 340 F. App'x 243, 245 (5th Cir. 2009) (per curiam) (unpublished) ("To the extent that Garza raises other arguments not included within the scope of our order granting the certificate of appealability, we do not consider them." (citing *Neville v. Dretke*, 423 F.3d 474, 478 (5th Cir. 2005)); *Richardson v. Quarterman*, 537 F.3d 466, 472 n.2 (5th Cir. 2008) ("Because this court granted a COA only on the issue of whether the appearance of bias was a structural error, any claim of actual bias is not properly before the court." (citing 28 U.S.C. § 2253(c); *Lackey*, 116 F.3d at 151-52)); *see also, e.g.*, *United States v. Berry*, 624 F.3d 1031, 1039 n.7 (9th Cir. 2010) ("Because the *Brady* claim was not included in [Berry's] § 2255 motion, it was not addressed by the district court and falls outside the scope of our certificate of appealability.").

No. 11-60564

. . . have original jurisdiction . . . of all offenses against the laws of the United States." As the Supreme Court reaffirmed in *United States v. Cotton*, this means that the district court's subject matter jurisdiction extends to "'all crimes cognizable under the authority of the United States.'"[17] We determine whether a district court had subject matter jurisdiction in a criminal case by looking at the indictment or information.[18] "To confer subject matter jurisdiction upon a federal court, an indictment need only charge a defendant with an offense against the United States in language similar to that used by the relevant statute."[19] Here, the information charged misprision of a felony in violation of 18 U.S.C. § 4, tracking the statutory language. Specifically, it charged:

> On or about November 1, 2007, in the Northern District of Mississippi, DAVID ZACHARY SCRUGGS, defendant, having knowledge of the actual commission of a felony cognizable by a court of the United States, concealed and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, in violation of Title 18, United States Code, Section 4.[20]

---

[17] *Cotton*, 535 U.S. at 630-31 (quoting *Lamar v. United States*, 240 U.S. 60, 65 (1916)); *see, e.g.*, *Prou v. United States*, 199 F.3d 37, 45 (1st Cir. 1999) ("[A] federal district court plainly possesses subject-matter jurisdiction over drug cases. . . . Once subject-matter jurisdiction has properly attached, courts may exceed their authority or otherwise err without loss of jurisdiction." (citations omitted)).

[18] *See, e.g.*, *United States v. Jackson*, 313 F.3d 231, 233 (5th Cir. 2002) ("The district court had jurisdiction over the case because a violation of federal law was charged, regardless of the sufficiency of the Government's proof." (citation omitted)).

[19] *United States v. Jacquez-Beltran*, 326 F.3d 661, 662 n.1 (5th Cir. 2003) (per curiam).

[20] The statutory language is:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4.

No. 11-60564

It is true that *Skilling*, which held that the federal honest services fraud statute criminalizes only bribery and kickback schemes,[21] later rendered the facts proffered at the plea hearing insufficient to establish that Scruggs had knowledge of a felony cognizable by a court of the United States – a central element of the charged offense. But Scruggs's insistence that the question of subject matter jurisdiction requires us to look beyond the information has no basis in any controlling precedent. Indeed, even in *United States v. Peter*,[22] an Eleventh Circuit case on which Scruggs heavily relies, the court's finding of a lack of subject matter jurisdiction was based on the language of the indictment rather than any factor extrinsic to the indictment.[23] *Peter* undertakes to distinguish itself from *Cotton* and *Bousley*, and in the course of describing what *Peter* is not, the Eleventh Circuit describes what our case is:

> Unlike the error asserted here, there was no claim in *Cotton* that the indictment consisted only of specific conduct that, as a matter of law, was outside the sweep of the charging statute. . . .
>
> The Government's reliance on *Bousley* . . . is likewise misplaced. . . . The indictment under which Bousley was charged . . . . simply recited the elements of the offense, without identifying any specific facts by which the alleged conduct would be shown. As in *Cotton*, the indictment in *Bousley* unquestionably alleged the crime charged. . . .
>
> [I]t is clear . . . that the Government's proof of [Peter's] alleged conduct, no matter how overwhelming, would have brought it no closer to showing the crime charged than would have no proof at all. . . . Peter's innocence of the charged offense appears from the very allegations made in the superseding information . . . .[24]

---

[21] *See Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010).

[22] 310 F.3d 709 (11th Cir. 2002).

[23] *See id.* at 715.

[24] *Id.* at 714-15 (citations omitted).

No. 11-60564

Whatever may be *Peter*'s fidelity to *Cotton*, it is plain that, in this case, the *Peter* court would reach the same conclusion that we do.[25]  Because the information charged an offense against the laws of the United States, Scruggs's jurisdictional claim is without merit.

**IV.**

We now turn to the three issues certified for appeal: Scruggs's claims of ineffective assistance of counsel, governmental misconduct, and actual innocence.

*A.    Ineffective Assistance*

Scruggs's ineffective assistance claim is based on an alleged conflict created by Attorney Farese's simultaneous representation of Scruggs and Joey Langston for a one-month period in December 2007 and January 2008.

While ineffective assistance of counsel claims are not subject to the usual procedural default rule, they still must be brought within the one-year limitations period for § 2255 motions.  A § 2255 movant generally must file his claim(s) for relief within one year of the date when his conviction becomes final.[26]  When a defendant does not file a direct appeal, his conviction becomes final on the day when the time for filing a direct appeal expires.[27]  In this case, the time to file a direct appeal expired on July 14, 2008.  Because Scruggs did not file his § 2255 motion until August 18, 2010, his ineffective assistance claim cannot be

---

[25] For an explanation of why, under *Cotton*, *Skilling* would not bear on the jurisdictional question even if the facts here were closer to those in *Peter*, we direct the reader to Judge Selya's thoughtful opinion in *United States v. George*, 676 F.3d 249 (1st Cir. 2012).  *See id.* at 259 ("[A]n indictment's factual insufficiency does not deprive a federal court of subject matter jurisdiction. . . .  The opinion in *Skilling* merely clarifies that to convict someone of honest-services fraud, a factual showing of bribery or kickbacks is compulsory.  While this holding rendered the instant information factually insufficient, it did not divest the district court of subject matter jurisdiction over the case." (citations omitted)).

[26] 28 U.S.C. § 2255(f)(1).

[27] *See United States v. Plascencia*, 537 F.3d 385, 388 (5th Cir. 2008).

No. 11-60564

deemed timely under § 2255(f)(1).  However, the statute provides alternative trigger dates for the one-year limitations period,[28] including "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."[29]  Here, relying on § 2255(f)(4), Scruggs claims that his governmental misconduct claim was timely filed because he brought it within a year of learning that Attorney Anthony Farese had represented both Scruggs and Joey Langston when the two men had conflicting interests.

Scruggs claims that he was first alerted to the conflict by a book by former prosecutor Tom Dawson published in December 2009.  According to Scruggs, the book revealed that Farese was already negotiating with the Government for Langston to provide Rule 404(b) evidence against Scruggs in December 2007. However, as the district court noted, the book that Scruggs claims first alerted him to the Government's alleged deal with his former attorney was not introduced into evidence at the evidentiary hearing, and there is no other evidence suggesting that Farese was negotiating with the Government for Langston to testify against Zach Scruggs during the period when he represented both men.  To the contrary, former prosecutor David Sanders testified that at the time of the events in question, the Government had no knowledge that Langston knew anything about Zach Scruggs being involved in the other case.  When Dawson testified at the hearing on Scruggs's motion to disqualify Assistant U.S. Attorney Robert Norman, counsel did not ask Dawson about the events described in the book.

Therefore, the factual basis for Scruggs's claim is merely that, during a period when Farese represented Zach Scruggs in this case, Farese also

---

[28] *See* 28 U.S.C. § 2255(f)(2)-(4).

[29] *Id.* § 2255(f)(4).

15

represented Joey Langston in the *Wilson*/DeLaughter case. And over a month after Zach Scruggs fired Farese as his lawyer, prosecutors suggested to the court that Langston would implicate Zach Scruggs in another judicial corruption scheme. Because Zach Scruggs knew or easily could have discovered these facts by the date on which his conviction became final, his ineffective assistance claim is untimely.

To prove ineffective assistance of counsel based on a conflict of interest, a § 2255 movant must show "that an actual conflict of interest adversely affected his lawyer's performance."[30] A voluntary and unconditional guilty plea waives all non-jurisdictional defects antecedent to the plea.[31] Thus, to prevail on his ineffective assistance claim, Scruggs also must show that counsel's alleged conflict of interest rendered his guilty plea involuntary. There is no evidence that, during the period of the multiple representation, Langston ever indicated to Farese or anyone else that Zach Scruggs was involved in the *Wilson*/DeLaughter matter, let alone that Langston had information that would aid the prosecution in Zach Scruggs's case. Because Scruggs has not shown "that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."[32] Nor has he established that counsel's actions affected the voluntariness of his plea.

*B. Governmental Misconduct*

Scruggs's governmental misconduct claim overlaps to some extent with his ineffective assistance claim. Scruggs alleges that the Government engaged in misconduct when it represented to the court that Langston would testify that Scruggs "was fully aware" of the criminal conduct in the *Wilson*/DeLaughter

---

[30] *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

[31] *See United States v. Stevens*, 487 F.3d 232, 238 (5th Cir. 2007).

[32] *Cuyler*, 446 U.S. at 350.

case.  As with his ineffective assistance claim, Scruggs can only prevail if he demonstrates that the claim is timely and that the alleged governmental misconduct affected the voluntariness of his plea.[33]  Because Scruggs did not raise the claim on direct appeal, he also must show cause and prejudice with regard to the default or that he is actually innocent.[34]

Scruggs argues that his governmental misconduct claim is timely because – again – he did not learn about the misconduct until the publication of Dawson's book in December 2009.  However, as already noted, the book was never introduced into evidence and does not provide a factual basis for his claim.  As with his ineffective assistance claim, Scruggs knew the relevant facts, or could have discovered them with due diligence, by the time his conviction became final.  He knew that the Government had represented to the court that he was fully aware of the *Wilson*/DeLaughter scheme.  He later heard the Government step back from this assertion.  Prosecutors informed his lawyers, albeit not on the record, that the only information Langston had provided about Zach Scruggs with regard to the *Wilson*/DeLaughter matter was that Scruggs knew about the behind-the-scenes hiring of Ed Peters.  In addition, Farese contacted Scruggs's new lawyers and assured them that Langston would not give any inculpatory testimony against Scruggs – that Langston's position was that Zach Scruggs was unaware of any criminal conduct in the *Wilson* case.

Even if we were to conclude that Scruggs's governmental misconduct claim was timely filed, it fails on the merits because he has not shown that the alleged

---

[33] *See* 28 U.S.C. § 2255(f); *Stevens*, 487 F.3d at 238.

[34] *See Bousley v. United States*, 523 U.S. 614, 622 (1998). Because we conclude that Scruggs's governmental misconduct claim is time-barred and without merit, we do not reach the issue of procedural default.

No. 11-60564

misconduct induced him to plead guilty.[35]  Scruggs claims that the misconduct he alleges forced him to enter a guilty plea because he could not risk the effect of Langston's testimony.   However, Scruggs made the choice to enter the plea rather than proceed to a Rule 404(b) hearing at which he could have confirmed the true extent of the information Langston provided to the Government.  His claim that he had "no reasonable choice" but to enter his plea before the Rule 404(b) hearing took place is without support. Moreover, Scruggs's assertion that he was intimidated into pleading guilty is not credible in light of the Government's repeated assurances to defense counsel that Langston would not testify that Zach Scruggs was aware of any of the criminal conduct in the *Wilson*/DeLaughter case.

### C.    Actual Innocence

Finally, Scruggs argues that the decision in *Skilling* establishes that he is actually innocent of the charge of misprision of a felony and that he also is innocent of all the charges in the original indictment.  "Actual innocence" is not a free-standing ground for relief.[36]  Rather, it is a gateway to consideration of claims of constitutional error that otherwise would be barred from review.[37]  We need not decide whether Scruggs is actually innocent because we have concluded that Scruggs's constitutional claims fail on the merits.  In other words, we would find no ground for relief on the other side of the gate.

---

[35] *See Brady v. United States*, 397 U.S. 742, 755 (1970); *United States v. Cothran*, 302 F.3d 279, 283 (5th Cir. 2002).

[36] *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) ("[A]ctual-innocence is *not* an independently cognizable federal-habeas claim."); *see, e.g.*, *Matheson v. United States*, 440 F. App'x 420, 421 (5th Cir. 2011) (per curiam) (unpublished) (applying this rule in the § 2255 context).

[37] *See McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012).

No. 11-60564

## V.

Because Scruggs has not demonstrated that he is entitled to relief under 28 U.S.C. § 2255 on any ground, the district court's judgment is AFFIRMED.